# IN THE DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF MARYLAND

| | |
|---|---|
| **JARED ASHER** | * |
| A minor, by his parents and next friends, | * |
| Blaine and Janet Asher, | |
| 5032 Westpath Ter. | * |
| Bethesda, MD 20816 | |
| | * |
| and | |
| | * |
| **BLAINE AND JANET ASHER**, | * |
| 5032 Westpath Ter. | |
| Bethesda, MD 20816, | * |
| | Civil Action No._____ |
| Plaintiffs, | * |
| | |
| v. | * |
| | |
| **BOARD OF EDUCATION OF MONTGOMERY COUNTY**, | * |
| 850 Hungerford Drive | * |
| Rockville, MD 20850, | * |
| | |
| and | * |
| | |
| **JERRY D. WEAST**, (Officially as) | * |
| SUPERINTENDENT | |
| BOARD OF EDUCATION OF | * |
| MONTGOMERY COUNTY | |
| 850 Hungerford Drive | * |
| Rockville, MD 20850 | |
| | * |
| Defendants. | |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

**Preliminary Statement**

1.      This is an action for compensatory education, for Jared Asher, in the form of private placement in a non-public school for a learning disabled child after the Board of Education for Montgomery County Public Schools wrongfully failed to provide Jared with a free appropriate education as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq. And Maryland Law.

**Jurisdiction**

2.      This Court has original jurisdiction over this matter pursuant to the IDEA, 20 U.S.C. §§1400-1461; the Rehabilitation Act of 1973 ("Section 504"); 29 U.S.C. §794; 42 U.S.C. §1983; and 28 U.S.C. §§1331 and 1334. Declaratory relief is authorized by 28 U.S.C. §§2201-2202. This Court has pendant jurisdiction pursuant to Md. Code Ann., Educ. Art. §§8-401 et seq., (1996). Plaintiffs have exhausted their state administrative remedies and appeal to this Court from a decision of an Administrative Law Judge of the Maryland Office of Administrative Hearings, MSDE-MONT-OT-200200285.

**Parties**

3.      Jared Asher is a disabled child who at all times relevant to this action has been a resident of Montgomery County, Maryland in the Wood Acres Elementary School District. His parents bring this action on Jared's behalf and in their own right.

4.      The Board of Education for Montgomery County is a local education agency as defined by 20 U.S.C. §1401, and as such, receives financial assistance from the United States Department of Education. The Board of Education for Montgomery County is responsible for complying with State and Federal law with respect to the provision of a free appropriate public

2

education to each disabled child in Montgomery County.

5.      Jerry D. Weast is the Superintendent of Montgomery County Public Schools ("MCPS") and, as such, is the public official charged with the responsibility for ensuring that MCPS complies with federal law as to the education of disabled children.  He is sued in his official capacity.

Factual Allegations

1.      Jared Asher is an eight year old boy who was born on May 13, 1995.  Under the IDEA Jared qualifies as a child with Attention Deficit Hyperactivity Disorder (ADHD) and a learning disability.

2.      Jared attended kindergarten and first grade at Wood Acres Elementary School (WAES) during the 2000-01 and 2001-02 school years.  During that time, Jared received no special education or related services.

3.      In May, 1999, before Jared attended WAES, he was privately evaluated by Dr. Ann Kendall, Ph.D., a psychologist, and Lynn Balzer Martin, O.T.R., an occupational therapist.

4.      These evaluations were conducted because of concerns Jared's parents had about his ability to learn while he was attending preschool.

5.      The occupational therapist reported that Jared had significantly delayed fine motor skills and recommended that the parents obtain direct occupational therapy for Jared.

6.      In kindergarten at WAES, Jared displayed behavioral and attentional problems that required direct teacher intervention.  Ms. Bruno, Jared's kindergarten teacher, implemented behavior contracts to assist Jared for problems he was demonstrating both in and out of the classroom.

7.      Mrs. Asher provided Ms. Bruno with the private evaluations that Jared had while in preschool.  Mrs. Asher discussed these evaluations with Ms. Bruno but no individualized education plan (IEP) meeting was held at any point during the 2000-01 school year, despite both Mrs. Asher's and Ms. Bruno's concerns regarding Jared's performance in school.

8.      At the beginning of the 2001-02 school year, Ms. Coleman, Jared's first grade teacher, was not aware of the difficulties Jared had during the previous year because Ms. Bruno left WAES before Ms. Coleman could discuss Jared with her.

9.      However, in early October of 2001, a parent-teacher conference was held between Ms. Coleman and Mrs. Asher.  At this meeting, Mrs. Asher informed Ms. Coleman of her concerns for Jared and made Ms. Coleman aware of the behavior contracts that Ms. Bruno had used.

10.     New behavior contracts were developed and on October 8, 2001 Ms. Coleman began using behavior contracts for Jared.

11.     During October, 2001, the Ashers arranged for Jared to be privately tested by Dr. Kathleen van Hover.

12.     In early November, 2001, Mrs. Asher discussed the private testing with Ms. Coleman and provided her a teach questionnaire from Dr. van Hover.

13.     Ms. Coleman completed the questionnaire on November 15, 2001 and made specific note of Jared's behavioral problems.

14.     During the first half of the 2001 school year, Mrs. Asher kept contact with Ms. Hall, the principal, and continuously informed her of her concerns.  Despite these repeated discussions, and WAES's knowledge that private testing was being done, no IEP meeting was held nor were the parents ever provided with their IDEA procedural safeguards.

15. On January 8, 2002, Ms. Coleman set up a meeting with the Ashers. Prior to this meeting, Ms. Toole, WAES guidance counselor, observed Jared on two occasions as part of the ARD screening.

16. These observations reported that Jared could only focus in the classroom for five minutes at a time, was easily distracted and was confused when reading directions.

17. The meeting between Mrs. Asher, Ms. Coleman, Ms. Toole and Ms. McCaffery was held on January 11, 2002. At this meeting the behavior contracts were discussed as well as Jared's attentional difficulties. This was not an IEP meeting and again Mrs. Asher was not provided with her procedural safeguards.

18. Dr. van Hover evaluated Jared on January 25 and 28, 2002. Jared's results showed that his IQ placed him in the superior range of intellectual functioning. Dr. van Hover concluded that Jared had Attention Deficit Hyperactivity Disorder (ADHD) and required explicit instruction in reading and writing in a small group environment. Dr. van Hover also opined that Jared had a learning disability not otherwise specified.

19. Under the requirements of the IDEA, the discrepancy between Jared's IQ and his academic achievement qualified him as a learning disabled student.

20. On February 22, 2002, Mrs. Asher gave WAES a copy of Dr. van Hover's evaluation.

21. An IEP screening meeting was held on March 5, 2002 at which time the Ashers reminded the IEP team about the evaluations that Jared had while in preschool.

22. On May 9, 2002, Dr. J.H. Roberts, MCPS' psychologist, review Dr. van Hover's report and accepted it on behalf of MCPS. Prior to the IEP meeting, Dr. Roberts did not have any conversations with the Ashers. However, he observed Jared twice before the IEP meeting and

recommended an educational plan be implemented.

23.  Dr. Roberts was not called to testify by MCPS.

24.  Ms. Briggs is the special education resource teacher at WAES and observed Jared once for only 30 minutes in Ms. Coleman's classroom on May 20, 2002.

25.  On May 21, 2002, a final IEP meeting was held. The team decided that Jared did not qualify for special education services despite the obvious 25 point discrepancy between his IQ and academic achievement. The team, instead, found that no discrepancy existed.

26.  At this IEP meeting the behavior contracts that were used for Jared were never discussed or analyzed to determine whether Jared's behavior was interfering with his academic achievement.

27.  While the IEP team determined that Jared had ADHD and that this condition negatively impacted Jared's academic performance, specifically with this work product, MCPS did not engage in the legally required process to determine whether or not Jared qualified for special education services as a student with an other health impairment as defined by the IDEA.

28.  Instead of an IEP, the IEP team gave Jared a 504 plan consisting of some accommodations and modifications. However, these accommodations and modifications did not add anything to the ones that were already being used by Ms. Coleman.

29.  No occupational therapist attended the IEP meeting even though one was needed to determine if Jared needed special educational services and, if so, to what extent.

30.  On June 3, 2002, the Ashers wrote Ms. Hall noting their disagreement with the IEP team's decision and stated their intention of sending Jared to the LAB school. No one from MCPS attempted to contact the Ashers or revisit the IEP team's decision.

6

31.     Jared started the LAB school in Fall 2002 and began receiving special education services immediately that were implemented through an IEP.

32.     Because of the numerous times that the Ashers discussed their concerns about Jared's lack of progress with MCPS as well as the behavior contracts and Jared's lack of improvement in his behavior and academic performance, MCPS knew or should have known that Jared was in need of special education services.

33.     However, MCPS only took action and held an IEP meeting after the parents obtained private evaluations and confronted the school system with those evaluations.

34.     34 C.F.R. §300.343(b)(1) states that within a reasonable period of time following parental consent an evaluation should be made.  MCPS did not give Jared an evaluation within a reasonable period of time.  The first instance that MCPS was aware of private evaluations was when Jared entered Kindergarten.  No evaluations were performed by MCPS during that school year.  In November, 2001, Ms. Coleman was aware that private evaluations were going to be performed.  Still, MCPS waited until the end of the 2001-02 school year to hold an IEP meeting.

35.     COMAR 13A.05.01.06 requires and IEP team to complete an evaluation of a student within 90 days of a receiving a written a referral. MCPS failed to adhere to this provision by failing to initiate an IEP meeting in the 2000-01 school year and again by failing to initiate an IEP meeting in November, 2001.

36.     MCPS failed to evaluate Jared in all areas of a suspected disability resulting in procedural and substantive denial of a free appropriate public education (FAPE).  This violation is demonstrated by MCPS' failure to have an occupational therapist evaluate Jared and attend the IEP meeting when Jared's disabilities include deficiencies in his motor abilities.

37. MCPS identified Jared as a child with a disability, specifically ADHD, and underlying psychomotor speed deficits, but failed to provide him with the special education services needed to address those disabilities. Specifically, the IEP team developed a 504 plan rather than an IEP which is required in Jared's case. 34 C.F.R. §300.7(9) includes ADHD as one of the disabilities under "other health impairment" that needs to be addressed by an IEP.

38. The decision by the administrative law judge makes several critical mistakes in its factual allegations. It asserts that Mrs. Asher did not provide WAES with any evaluative material in kindergarten. This assertion is incorrect and is contrary to Mrs. Asher's testimony, which is supported by evidence.

39. The decision states that the behavior contracts, used by Ms. Coleman, demonstrate an improvement by Jared. Again, the evidence proves that these contracts show that Jared's behavior continuously declined through the 2001-02 school year.

40. The decision also raises the issue of the parents not making an objection to the IEP team at the May 21, 2002 IEP meeting. This fact is irrelevant since the parents are not educational experts and are not required to make objections. However, soon after that meeting, the Ashers did inform Ms. Hall of their disagreement with the IEP team's decision.

41. It is also erroneous to determine that since Mr. Asher handed the IEP team an article pertaining to 504 plans that this demonstrated the Asher's desire to have a 504 plan implemented. Again, the Ashers are not the educational experts in this case and a mere suggestion by one of the parents should not be the determining factor for Jared's educational plan. More focus by the IEP team should have been placed on Jared's discrepancy between his high cognitive abilities and his low academic performance.

42. The ALJ's decision is also incorrect in stating that Dr. van Hover never analyzed Jared's progress at WAES. To the contrary, the evidence shows that Dr. van Hover was provided work samples and gave Jared's teachers questionnaires to fill out to aid her in the evaluations.

43. While the ALJ's decision is correct in finding that the burden of proof is on MCPS, it is incorrect in finding that MCPS met their burden.

44. MCPS committed several procedural violations that resulted in the denial of FAPE, which makes it impossible for MCPS to have met its burden. They did not meet the reasonable time period proscribed under federal law or the 90 day period proscribed under Maryland law.

45. Further, the decision is erroneous in agreeing with MCPS that Jared does not qualify for special education services. MCPS accepted that Jared had ADHD but never engaged in the process to determine whether or not he qualified as "other health impaired". Under the IDEA, Jared did meet the standard as a child with a learning disability.

46. The decision is also erroneous in that it fails to address several substantive issues. It does not consider whether Jared qualified as student with a learning disability and whether that disability impacted his ability to access the curriculum. In doing so, the decision does not consider Jared's high intellectual capacity in relation to the lack of progress made at WAES. The decision also does not address the interventions that were necessary to integrate Jared's participation in the general education environment.

47. The findings and conclusions of the ALJ are contrary to the law and evidence.

48. The plaintiffs were aggrieved by the decision of the ALJ.

49. The plaintiffs have exhausted their administrative remedies.

## **COUNT I**

50. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 49.

51. Defendants' failure to provide Jared Asher with a free appropriate public education, including an appropriate educational placement and appropriate special education services, and defendants' failure to follow statutory procedures violates plaintiffs' rights under the IDEA, Section 504, Section 1983, and Maryland law.

## COUNT II

52. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 49.

58. The failure of Administrative Law Judge to order Defendants to reimburse Asher's for the costs associated with Jared's placement at the LAB school violates and the failure of the ALJ to find that Jared Asher is in need of special education services violates the IDEA, Section 504, Section 1983 and Maryland Law.

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Issue judgment for Plaintiffs and against Defendants;

2. Issue declaratory relief that Defendants violated Plaintiffs' rights under applicable law;

3. Issue injunctive relief ordering compensatory education in the form of private placement;

4. Issue declaratory relief that a residential treatment center is Jared Asher's educational placement;

5. Order Defendants to pay Plaintiffs reasonable attorneys' fees and costs, including the fees and costs of this action; and

6. Award any other relief that this Court deems just.

                                                  Respectfully submitted

                                                  Julie A. Starbuck
Parker & Starbuck, P.C.
10722 Lexington Street
Kensington, MD 20895
(301) 929-5900
Attorneys for the Plaintiffs